Chemcraft Holdings Corp. v. Shayban, 2006 NCBC 13

| | |
|---|---|
| NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF GUILFORD | 06 CVS 5227 |

CHEMCRAFT HOLDINGS CORPORATION, )
CHEMCRAFT INTERNATIONAL, INC. and )
CHEMCRAFT PACIFIC, L.L.C., )
                          )
           Plaintiffs, )
                          )         ORDER AND OPINION
                          )
      v.                     )
                          )
FOUAD SHAYBAN, )
                          )
          Defendant. )
                          )

{1}      This case arises out of Plaintiffs Chemcraft Holdings Corporation, Chemcraft International, Inc., and Chemcraft Pacific, L.L.C.'s suit for declaratory judgment brought against Defendant Fouad Shayban. This matter comes before the Court on Defendant's motion to disqualify counsel.

{2}      After considering the briefs and oral arguments, the Court GRANTS Defendant's motion to disqualify counsel on the grounds that: (1) Mr. Rossabi's actions, while unintentional and inadvertent, give the appearance of impropriety requiring this Court to preserve public confidence in our system; and (2) section 4.2 of the Chemcraft Pacific, L.L.C. Operating Agreement bars Isaacson Isaacson & Sheridan, L.L.P. from continued representation. Defendant's request that he be awarded his attorneys' fees in connection with this motion is DENIED.

> *Isaacson Isaacson & Sheridan, L.L.P. by Jennifer N. Fountain and Desmond G. Sheridan for Plaintiffs Chemcraft International, Inc. and Chemcraft Pacific, L.L.C.*
>
> *Forman Rossabi Black, P.A. by Amiel J. Rossabi for Plaintiff Chemcraft Holdings Corporation.*
>
> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P. by Mack Sperling and Benjamin R. Norman for Defendant Fouad Shayban.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{3}      This action for declaratory judgment was filed in Guilford County Superior Court on March 30, 2006. The case was designated mandatory complex business and assigned to the undersigned Special Superior Court Judge for Complex Business Cases by order of the Chief Justice of the Supreme Court of North Carolina dated May 22, 2006.

{4}      Defendant filed a motion to disqualify counsel on August 18, 2006, moving the Court to disqualify attorneys Amiel J. Rossabi and all other members of the law firm Forman Rossabi Black, P.A., and Jennifer N. Fountain and all other members of the law firm Isaacson Isaacson & Sheridan, L.L.P.

from serving as counsel to Plaintiffs Chemcraft Holdings Corporation, Chemcraft International, Inc., and Chemcraft Pacific, L.L.C. The Court heard oral arguments on the motion on September 18, 2006.

## II.
## FACTUAL BACKGROUND
### A.
### THE PARTIES

{5} Plaintiff Chemcraft Holdings Corporation ("Holdings") is a corporation organized and existing under the laws of the State of North Carolina, with a registered office located in Guilford County, North Carolina.

{6} Plaintiff Chemcraft International, Inc. ("International") is a corporation organized and existing under the laws of the State of North Carolina, with a registered office located in Guilford County, North Carolina.

{7} Plaintiff Chemcraft Pacific, L.L.C. ("Pacific") is a limited liability company organized and existing under the laws of the State of North Carolina, with a registered office located in Guilford County, North Carolina.

{8} Defendant Fouad Shayban was, at times relevant to this action, a citizen and resident of Forsyth County, North Carolina. Defendant became a resident of California in January of 2001.

{9} Chemcraft International is engaged in the business of manufacturing industrial wood coatings. Chemcraft International, Company Profile, http://www.chemcraft.com/companyprofile .htm (last visited Sept. 27, 2006). Pacific was formed with the goal of extending Chemcraft's reach into markets in the western United States.

{10} Pacific is owned twenty percent by Defendant and eighty percent by Holdings, a subsidiary of International.

{11} Defendant became president of Pacific pursuant to a written Memorandum of Agreement ("Employment Agreement") dated November 6, 2000.

{12} The Operating Agreement for Pacific was signed on December 31, 2000.

{13} Holdings, International, and Defendant are parties to a Shareholders' Agreement dated October 1, 2001 which governs Defendant's ownership of 1.54% of the shares of International.

### B.
### THE UNDERLYING DISPUTE

{14} Defendant's employment term as president of Pacific ended on October 31, 2005. Following expiration of the employment term, Defendant and Pacific were unable to reach a new employment agreement, and Defendant's employment was not renewed. (Compl. ¶ 8.)

{15} The Employment Agreement sets forth certain amounts and benefits to be paid Defendant. (Compl. ¶ 11.) Plaintiff Pacific believes Defendant is entitled to "significantly less" than the amount he demanded (Compl. ¶¶ 12–13) and is seeking a declaratory judgment to determine the proper amount (Compl. ¶ 14).

{16} Plaintiffs are also seeking a declaratory judgment to determine whether certain provisions of the Employment Agreement are valid and enforceable against Defendant. (Compl. ¶ 19.)

{17} Plaintiffs and Defendant further disagree on the amount due Defendant under the Chemcraft Pacific Operating Agreement (Compl. ¶ 25) and the Chemcraft International Shareholders' Agreement

(Compl. ¶ 32.)

{18}   Defendant has in turn counterclaimed for breach of the Employment Agreement, violation of the North Carolina Wage and Hour Act, breach of the Operating Agreement, and breach of fiduciary duty. (Answer & Countercl. 16.)

{19}   All the claims involve, either directly or indirectly, the termination of Defendant's employment and interpretation of the Operating Agreement.

## C.
## ISAACSON ISAACSON & SHERIDAN, L.L.P., AND THE FORMATION OF PACIFIC

{20}   When Holdings and International decided to form Pacific, they turned to the Greensboro, North Carolina law firm of Isaacson Isaacson & Sheridan, L.L.P. ("IIS") to handle the legal aspects of the formation of the L.L.C.  (Def.'s Mem. Supp. Mot. to Disqualify 2; Pl. International & Pacific's Mem. Opp. Mot. to Disqualify 2.)  There is a dispute between the parties as to who actually drafted the L.L.C. Operating Agreement.  Defendant claims IIS attorneys drafted the Operating Agreement.  (Def.'s Mem. Supp. 2.)  Plaintiffs Pacific and International claim that David B. Rogers, an officer of Holdings and International, drafted the agreement and that attorney Marc Isaacson merely reviewed the agreement.  (Pl. International & Pacific's Mem. Opp. 2; Rogers Aff. ¶ 3, Sept. 6, 2006.)  The question of who drafted the Operating Agreement could become an issue.

{21}   Section 4.2 of the Operating Agreement provides that "[i]n the event of any dispute between the parties hereto, the attorneys for the Company shall not act for either of the Members." (Pl. International & Pacific's Mem. Opp. 2.)   The two "Members" of the L.L.C. were Holdings and Defendant.   The "Company" refers to Pacific.

{22}    On March 30, 2006, Jennifer N. Fountain of IIS filed the Complaint in this action against Defendant on behalf of all three Chemcraft entities—International, Holdings, and Pacific.  (Compl. 7.)

{23}    In May of 2006, Ms. Fountain—evidently recognizing the conflict—telephoned Amiel J. Rossabi of Forman Rossabi Black, P.A. and asked if he could represent Holdings in this lawsuit.  (Rossabi Aff. ¶ 9, Sept. 7, 2006.)  He accepted.  This telephone call took place after Mr. Rossabi had spoken with Defendant as described below.  Ms. Fountain knew that Rossabi had spoken with Defendant because Rossabi had called her about waiving the conflict.  IIS continues to represent Pacific and International.  At issue is whether section 4.2 of the Operating Agreement prevents IIS from representing Pacific and International.

## D.
## CONTACT BETWEEN DEFENDANT AND ROSSABI

{24}    After receiving notice of this action, Defendant began searching for an attorney to represent him.  His first call was to Richard Gottlieb at Kilpatrick Stockton, L.L.P. in Winston-Salem, North Carolina.  Defendant also faxed the following three documents to Mr. Gottlieb:  (1) (1) a memorandum dated April 1, 2006 to Defendant's California attorney discussing the facts of Defendant's employment with Pacific, settlement possibilities, and possible claims; (2) a document dated April 3, 2006 entitled "Employment Facts since June 1, 2005" summarizing Defendant's discussions with Pacific regarding his employment, and (3) a document dated April 6, 2006 entitled "Summary of Main Issues" discussing Defendant's interpretation of the Employment Agreement and his reasons for entering into it, and his discussions with Chemcraft about a possible merger of Pacific.  (Gottlieb Aff. ¶ 4, Sept. 12, 2006.)

{25}    Mr. Gottlieb informed Defendant he would be unable to represent him due to a conflict of

interest and referred him to Mr. Rossabi. (Shayban Aff. ¶ 3.) On April 13, 2006, Mr. Gottlieb sent an email to Mr. Rossabi telling him to expect a call from Defendant regarding possible representation. (Rossabi Aff. ¶ 2.) Attached to this email was a copy of the Complaint and the three documents created by Defendant and described above. (Gottlieb Aff. ¶ 4.)

{26}    Mr. Rossabi read and responded to Mr. Gottlieb's email on April 17, 2006. (Rossabi Aff. Ex. A.) However, he claims to have been unaware of the attached documents until June 26, 2006, when defense counsel Mack Sperling notified him of their presence. (Rossabi Aff. ¶ 11.) Mr. Rossabi confirmed the existence of the attachments by opening one of them, but claims never to have read them. (Rossabi Aff. ¶ 12–13.) These files remain on Mr. Rossabi's computer. (Rossabi Aff. ¶ 13.)

{27}    The facts surrounding the telephone conversation between Defendant and Mr. Rossabi are in great dispute between the parties. The call either took place on April 16 or 17 via telephone. According to Defendant, the conversation lasted for more than twenty minutes and included discussion of "substantive matters" involving the lawsuit as well as Defendant's thoughts and perspectives on the claims and counterclaims. Defendant recalls that at the conclusion of the conversation, Mr. Rossabi agreed to represent him and requested a retainer of $3,200. In Defendant's words, "[i]t was not a casual conversation." (Shayban Aff. ¶ 3.)

{28}    But according to Mr. Rossabi, he received only minimal information regarding the case and did not participate in discussions of any substantive issues. (Rossabi Aff. ¶ 4.) He also denies agreeing to represent Defendant and asking for a $3,200 retainer. (Rossabi Aff. ¶ 7.)

{29}    During the course of the conversation, Mr. Rossabi realized he had represented a Chemcraft entity several years prior in another matter. (Shayban Aff. ¶ 4; Rossabi Aff. ¶ 5.) He informed Defendant that the only way he could go forward with the representation was if both Defendant and Chemcraft waived the conflict. (Shayban Aff. ¶ 4, Rossabi Aff. ¶ 6.) Defendant instructed Mr. Rossabi to investigate the possibility of a waiver (Shayban Aff. ¶ 4; Rossabi Aff. ¶ 6), and Mr. Rossabi placed a call to Ms. Fountain, the attorney who had filed the Complaint on behalf of all the Chemcraft entities. (Rossabi Aff. ¶ 8.) After learning that Chemcraft refused to waive the conflict (Rossabi Aff. ¶ 8), Mr. Rossabi contacted Defendant and told him he would not be able to represent him. (Shayban Aff. ¶ 5; Rossabi Aff. ¶ 8).

{30}    In May of 2006, Ms. Fountain called Mr. Rossabi to ask if he could represent Holdings in the present action against Defendant. (Rossabi Aff. ¶ 9). Recognizing the potential problems that might be caused by his earlier conversation with Defendant, Mr. Rossabi contacted the North Carolina State Bar. A representative from the State Bar told Mr. Rossabi that he could represent Holdings against Defendant so long as he had not received any confidential information from Defendant or given him advice. However, at this point Mr. Rossabi was unaware of the confidential information contained in the attachment to Mr. Gottlieb's email, and did not inform the State Bar that such information was in his possession. (Rossabi Aff. ¶ 10.)

{31}    Mr. Rossabi then began representing Holdings in the present case.

{32}    On July 10, 2006, Defendant filed a grievance against Mr. Rossabi with the State Bar. The grievance complains that Mr. Rossabi received confidential information from Defendant and then proceeded to represent Holdings against him in contravention of Rule 1.18 of the Revised Rules of Professional Conduct of the North Carolina State Bar. (Rossabi Aff. Ex. F.)

III.

## MOTION TO DISQUALIFY COUNSEL

### A.
### IN GENERAL

{33}     When considering the disqualification of an attorney on grounds of conflict of interest, three principles guide courts' decisions.  First, attorneys practicing before the courts bear the burden of ensuring the absence of any conflicts of interest at the very outset of their representation of a client.  N.C. Rules of Prof'l Conduct R. 1.7 ("[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest."), 1.8 (providing specific rules for avoiding conflicts) (LEXIS through 2006 legislation).  Second, lawyers are responsible for reading what is sent to them.  This is not only good practice, it is also part of a lawyer's duty to avoid conflicts.  The receipt of confidential information from a client or prospective client may create a conflict in the future.

{34}     Third, the goal of maintaining public confidence in our system of justice demands that courts prevent even the appearance of impropriety and thus resolve any and all doubts in favor of disqualification.  *See, e.g.*, *United States v. Clarkson*, 567 F.2d 270, 273 n.3 (4th Cir. 1977); *Healthnet, Inc. v. Health Net, Inc.*, 289 F. Supp. 2d 755, 758 (S.D. W. Va. 2003).   In preventing the appearance of impropriety, the client's perception of events is of paramount importance and overshadows the details of his attorney's conduct.  The conduct of the attorney need not constitute a violation of the Rules of Professional Conduct, and certainly need not rise to the level of professional negligence in order to warrant disqualification.  The relevant cases instruct us to refrain from weighing the conduct of counsel with "hairsplitting nicety" in the context of a motion to disqualify.  *United States v. Trafficante*, 328 F.2d 117, 120 (5th Cir. 1964).  As Judge Goodwin so ably stated in *Healthnet*, "[a] motion to disqualify counsel . . . is not a referendum on the trustworthiness of the counsel sought to be disqualified.  It is, rather, a motion that should succeed or fail on the reasonableness of a client's perception that confidences it once shared with its lawyer are potentially available to its adversary.  Where a reasonable client would be concerned by a potential conflict, a court must err on the side of disqualification." *Healthnet*, 289 F.Supp. 2d at 763.

{35}     Where, as here, a prospective client is involved, we also look to Rule 1.18 of the Rules of Professional Conduct, which states that "[e]ven when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation."  N.C. Rules of Prof'l Conduct R. 1.18(b).  Furthermore, a lawyer who has had such discussions "shall not represent a client in the same or a substantially related matter if the lawyer received information from the prospective client that could be *significantly harmful* to that person in the matter." *Id*. R. 1.18(c) (emphasis added).  If a lawyer is disqualified for these reasons, then "no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation." *Id.*

### B.
### AMIEL J. ROSSABI AND FORMAN ROSSABI BLACK, P.A.

{36}    Turning first to the lawyer's duty to avoid conflicts of interest and read information sent to him, the problem here arises primarily as a result of Mr. Rossabi's apparent failure to read Mr. Gottlieb's email and discover the attachments that were there and their sensitive nature. When asked to represent Holdings in this lawsuit against Defendant, Mr. Rossabi was appropriately hesitant due to his conversation with Defendant.  He called the State Bar for guidance, but only discussed his notes from the telephone conversation, neglecting to mention the email from Mr. Gottlieb and its attachments.   The representative from the State Bar informed Mr. Rossabi that he could represent Holdings against Defendant as long as he

had not received any confidential information. (Rossabi Aff. ¶ 9.) Had he disclosed the Gottlieb email and the contents of the attachments when he called the State Bar, he might well have received a different answer and might well have come to a different conclusion about the conflict himself. The filing of the grievance prohibited him from making any subsequent inquiries of the State Bar.

{37} This represents one example among many this Court sees regularly of problems created by email that would not have existed with paper documents. The reality is that much legal business and correspondence is done by email, and lawyers must learn to use it with the same degree of care they formerly gave to paper documents they created or received. The courts will not treat information in emails any differently than if it were produced in paper form. Mr. Rossabi had a duty to thoroughly review the contents of Mr. Gottlieb's email and its attachments just as if he had received a letter in the mail from him. By receiving the email, he was on constructive notice of his possession of sensitive documents and should have taken steps to avoid a conflict of interest related to those documents. Analysis of these two principles weighs in favor of disqualification.

{38} The Court must also ensure the avoidance of even the appearance of impropriety. Even where there has been no violation of the Rules of Professional Conduct, it is the duty of this Court to safeguard public confidence in the legal system. Indeed, the Court finds no violations of the Rules of Professional Conduct in this case. It has been suggested both in affidavits and at oral argument that this Motion was filed in bad faith, for the purpose of retaliating against Mr. Rossabi for an arbitration award he won against another client of Mr. Sperling's in an unrelated matter. (Rossabi Aff. ¶ 17.) The Court does not find that there was any intentional effort to disqualify Mr. Rossabi or any motivation other than a sincere concern on the part of Mr. Shayban that his litigation strategy was in the hands of opposing counsel. Nor does the Court find that any use or disclosure of that information has been made by Mr. Rossabi. In sum, the Court does not find that Mr. Rossabi intentionally or knowingly violated any ethics rules.

{39} Yet as noted above, the Rules of Professional Conduct need not be violated in order to create an appearance of impropriety with the potential to undermine the credibility of the courts in the eyes of litigants. In this regard, the Court finds that the perception of a problem on Defendant's part is real and justifiable and that he did not create the problem. It arises from Mr. Rossabi's apparent failure to read his email carefully and the decision of Holdings to hire Mr. Rossabi knowing that he had discussed the case with Defendant sufficiently to call and ask for a waiver of any conflict. The Court notes that Mr. Rossabi did not call Defendant to confirm that there was no problem. Had he done so, he and Holdings might have avoided the problem before the Court. Had Holdings exercised better judgment in the selection of counsel to avoid a conflict, this problem might not be before the Court. There was a heightened duty here on the part of Mr. Rossabi and Holdings to be sure no conflict existed. Mr. Rossabi had received a referral from another lawyer with a conflict of interest. Mr. Rossabi had a conversation of sufficient depth that he recognized that he needed a conflict waiver from Holdings, and Holdings called upon Mr. Rossabi only after it was apparent that its original counsel had a conflict of interest and after they knew Mr. Rossabi had talked to Defendant.

{40} Mr. Rossabi asked in oral argument what else he could have done. He could have picked up the phone, called Defendant, and told him he had been asked to represent Holdings. Had he shown Defendant the same courtesy he gave to Holdings, he would have been on notice of the problem with the email and Defendant's concerns early on and could have dealt with the problem before the email sat in his computer for months.

{41} It is the responsibility of the courts and the members of the bar to maintain the confidence of the public in our system of justice. N.C. Rules of Prof'l Conduct R. 0.1(6) ("[A] lawyer should further the public's understanding of and confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority."). The focus of an inquiry into disqualification thus rests on the perception created by the lawyer's conduct. Here, Defendant may justifiably believe that he had a conversation with Mr. Rossabi about representing him and that Mr. Rossabi had in his possession for months a memorandum containing his thoughts on his claims and litigation strategy. He reasonably could be concerned when Mr. Rossabi, without any consultation with him about a conflict of interest, suddenly appeared as counsel for his opponent when its previous counsel had to step aside because of a conflict. According to his affidavit, Defendant was "shocked and surprised when Mr. Rossabi . . . entered the case as the lawyer for Chemcraft Holdings." (Shayban Aff. ¶ 6.) Were this Court to allow Mr. Rossabi to continue participating in this case, both Defendant and the public at large could justifiably question the integrity of the legal system.

{42} Finally, the Court finds that Mr. Rossabi should be disqualified from representing Chemcraft Holdings in this matter under the "significant harm" standard of Rule 1.18 of the Rules of Professional Conduct. Although there is no evidence that Mr. Rossabi has used or revealed the information he acquired from Mr. Gottlieb, he received the information and has retained possession of it for a period of months. Information of the kind that has been sitting in Mr. Rossabi's email files, namely Defendant's thoughts and litigation strategies, certainly could be "significantly harmful" to Defendant if used against him in the present action. Although there appear to be no North Carolina cases directly interpreting the "significantly harmful" language of Rule 1.18, this Court's treatment of a motion for disqualification in *Flick Mortgage Investors, Inc. v. Epiphany Mortgage, Inc.*, 2006 NCBC 3 (N.C. Super. Ct. Feb. 1, 2006), http://www.ncbusinesscourt.net/opinions/2006%20NCBC%203.htm, is instructive. There, the attorney to be disqualified under Rule 1.9 had general access to client files, *id.* ¶ 6, but, as here, denied acquiring any specific confidential information, *id.* ¶ 10. Nevertheless, the Court viewed this fact as weighing in favor of disqualification. *Id.* ¶ 11. The aim of Rule 1.18 is to prevent a lawyer who acquires strategic information from a prospective client from using that information against the client. On the battlefield, stumbling upon an opponent's secret plans may determine the outcome of an engagement; but in the courtroom, Rule 1.18 protects litigants from this fate by prohibiting an attorney from using confidential information to the detriment of a prospective client. The type of information prohibited by Rule 1.18 is exactly the type of information to which Mr. Rossabi has had access since receiving Mr. Gottlieb's email —a client's personal thoughts and impressions regarding the facts of his case and possible strategies for a lawsuit. The Court cannot allow Plaintiffs to be represented by counsel who has had access to such potentially damaging information.

{43} Contrary to Mr. Rossabi's arguments, mere access to this material is enough to justify his disqualification. Courts in other jurisdictions have found that an attorney's access to confidential documents warrants disqualification. In *Lovell v. Winchester*, 941 S.W.2d 466 (Ky. 1997), two clients consulted an attorney about representing them in a real property dispute. *Id.* at 467. They visited the attorney, consulted with him, and left a number of pertinent documents in his possession. *Id.* The attorney declined representation, then proceeded to represent the opposing side in the same litigation. *Id.* The attorney's argument in defense of his behavior was that he could recall nothing concerning his meeting

with the clients.  *Id.*.  The Supreme Court of Kentucky was not persuaded by this argument and ruled in favor of disqualification, citing many of the same concerns over the appearance of impropriety discussed above.  The Kentucky court also observed that since the attorney retained possession of the confidential documents for a long period of time, a presumption arose "that he became knowledgeable of their contents and that he learned confidential information relevant to the case." *Id.*  The attorney's argument that he did not remember the consultation was not sufficient to rebut this presumption.

{44}    This Court finds itself with a set of facts quite similar to those in *Lovell* and comes to the same conclusion.  The record shows that Mr. Rossabi received confidential information regarding Defendant's dispute with Chemcraft and that he retained possession of them for months.  This gives rise to the presumption mentioned in *Lovell* that Mr. Rossabi learned of the contents of Defendant's writings.  Mr. Rossabi's assertions that he did not open or read the confidential attachments cannot overcome either the *Lovell* presumption or this Court's duty to uphold the public reputation of the legal system by guarding against the appearance of impropriety on the part of counsel.  Quoting once more from the Supreme Court of Kentucky, "the mere appearance of impropriety is just as egregious as any actual or real conflict." *Am. Ins. Ass'n v. Ky. Bar Ass'n*, 917 S.W.2d 568, 573 (Ky. 1996).

{45}    For these reasons, the Court finds that Amiel J. Rossabi and all other members of the law firm Forman Rossabi Black, P.A. should be disqualified from serving as counsel to Plaintiff Chemcraft Holdings Corporation, as well as Chemcraft International, Inc. and Chemcraft Pacific, L.L.C.

C.

ISAACSON ISAACSON & SHERIDAN, L.L.P.

{46}    In the case of the Isaacson firm, the Court is guided not only by the aforementioned principles of professional responsibility but also by contract law.  This is because section 4.2 of the Pacific Operating Agreement prohibits the attorneys for Pacific from acting for either of the members in the event of a dispute between them.  Thus the disqualification analysis as it relates to IIS will turn upon the meaning of this provision.

{47}    When interpreting a contract, a court must discern the intention of the parties.  *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973).  If the plain language of a contract is clear, this is a straightforward task because the parties' intentions will be inferred from the words of the contract.  *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996).  Moreover, the law of contract interpretation steers courts away from "interpretations that result in superfluous terms." *Rosi v. McCoy*, 319 N.C. 589, 594, 356 S.E.2d 568, 571 (1987); *see also* Restatement (Second) of Contracts § 203, cmt. b (1981) ("Since an agreement is interpreted as a whole, it is assumed that no part of it is superfluous.")

{48}    The contract at issue here is the Operating Agreement for Chemcraft Pacific, L.L.C.  Section 4.2 of the Agreement provides that "[i]n the event of any dispute between the parties hereto, the attorneys for the Company shall not act for either of the Members."  Here there is a dispute between the parties to the agreement—Chemcraft Holdings and Defendant.  The plain language of section 4.2 unambiguously prohibits IIS, as the attorneys for the Company Pacific, from representing Holdings as a Member of the L.L.C.  Yet this is precisely what Ms. Fountain did when she filed the Complaint on behalf of Pacific, Holdings, and International against Mr. Shayban.  Such conduct is prohibited by the Operating Agreement.

{49}    This interpretation of section 4.2 is warranted by the principle of interpretation which tells the

Court that no part of a contract should be read to be superfluous. There is some dispute as to who actually drafted the Agreement, but IIS was responsible for forming Pacific and was involved in either drafting or reviewing its founding documents. At oral argument, Mr. Sheridan conceded that drafting the Operating Agreement would give a "specific insight" into the meaning of the provisions of the agreement. Section 4.2 was designed to prevent an individual or firm with such insights from representing one of the L.L.C. members against another in a dispute such as the one sub judice. It can only be there to protect against these insights being used by one member against another. Otherwise, it is without meaning and superfluous.

{50} It is clear from the facts and pleadings described above that one of the central issues in the underlying suit for declaratory judgment will be the termination of Defendant's employment with Pacific and what amount, if any, is due to him pursuant to the Operating Agreement. The interests of Pacific, Holdings, and International are all aligned and dependent on interpretations of the Operating Agreement. The protection afforded Defendant by section 4.2 would be meaningless if it could be circumvented by counsel simply representing a parent or subsidiary whose interest were aligned with Holdings. IIS attorneys were involved in drafting and reviewing the Operating Agreement and are prohibited by the very provisions of that agreement from using any insights they gained through their involvement in the formation process against Defendant in this action.

{51} Thus, the Court finds that Jennifer N. Fountain and all other members of the law firm Isaacson Isaacson & Sheridan, L.L.P. should be disqualified from serving as counsel to Plaintiffs Chemcraft International, Inc. and Chemcraft Pacific, L.L.C., as well as Chemcraft Holdings Corporation.


IV.

CONCLUSION

{52} Based upon the foregoing, it is hereby ORDERED, ADJUDGED and DECREED that Defendant's motion to disqualify counsel is granted. The Court denies Defendant's request that he be awarded his attorneys' fees in connection with this motion.

IT IS SO ORDERED, this the 5th day of October, 2006.